UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

LYNN STRANGE,
*individually and on behalf of all others
similarly situated,*

    Plaintiff,

    v.

CAPITAL ONE, N.A.,

    Defendant.

Civil Action No. 25-2711-TDC

## MEMORANDUM OPINION

Plaintiff Lynn Strange has filed this putative class action against Defendant Capital One, National Association ("Capital One") in which she alleges that Capital One knowingly collected credit card interest from class members at a rate exceeding the maximum permitted by Virginia law and thereby violated the National Bank Act, 12 U.S.C. §§ 85–86. Capital One has filed a Motion to Dismiss the Amended Complaint, which is fully briefed. The Court held a hearing on the Motion on June 25, 2026. For the reasons set forth below, the Motion will be GRANTED.

## BACKGROUND

### I.    Statutory Framework

The National Bank Act governs the interest rates that national banks such as Capital One are permitted to charge. Specifically, the statute provides that:

> Any [national banking] association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more.

12 U.S.C. § 85.

The National Bank Act prohibits the "taking, receiving, reserving, or charging a rate of interest greater than is allowed by [12 U.S.C. § 85], when knowingly done." *Id.* § 86. If a bank has charged interest in violation of this limitation, it must "forfeit[] . . . the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon." *Id.* Under such circumstances, "the person by whom it has been paid, or his legal representatives, may recover back, in an action in the nature of an action of debt, twice the amount of the interest thus paid from the association taking or receiving the same." *Id.* The statute of limitations for such claims is two years. *See id.*

Because Capital One is based in Virginia, the parties agree that it may charge interest up to the maximum rate permitted by Virginia law. Under Virginia law, the default "legal rate of interest shall be an annual rate of six percent," which is "implied when there is an obligation to pay interest and no express contract to pay interest at a specified rate." Va. Code Ann. § 6.2–301 (LexisNexis 2021). Virginia law further sets the maximum contractual interest rate on loans at 12 percent, subject to certain exceptions. *Id.* § 6.2–303. One such exception is for open-end credit plans, in relation to which Virginia law provides that "[n]otwithstanding any statutory or case law, any bank or savings institution may impose finance charges and other charges and fees at such rates and in such amounts and manner as may be agreed by the borrower under an open-end credit plan." *Id.* § 6.2–313(A). An "open-end credit plan" is "consumer credit extended by a creditor under a plan in which: (i) the creditor reasonably contemplates repeated transactions; (ii) the creditor may impose a finance charge from time to time on an outstanding unpaid balance; and (iii) the amount of credit that may be extended to the consumer during the term of the plan, up to any limit set by the creditor, is generally made available to the extent that any outstanding balance

is repaid." *Id.* § 6.2–300.  Thus, under the National Bank Act and Virginia law, Capital One may charge interest on credit card debt at any rate if it has an agreement with the cardholder to do so.

## II.     Capital One Credit Card Agreement

Defendant Capital One is a national bank based in Virginia that issues credit cards to its customers.  Plaintiff Lynn Strange is a resident of Bowie, Maryland.  In or about February 2024, Strange accepted and began using a Capital One credit card in Maryland.

In relation to the provision of the credit card, Capital One provided Strange with a form document entitled "Capital One Customer Agreement" ("the Credit Card Agreement" or "the Agreement") that stated that the Agreement, "including any changes to it," contained "the terms of your agreement with Capital One."  Credit Card Agreement at 1, Kurkowski Decl. Ex. A, ECF No. 27-3.  The Agreement also stated that Strange's account with Capital One would be governed by the Agreement, credit card statements, privacy notices, materials and disclosures provided upon the opening of her account, all other materials and disclosures relating to her account, and "any future changes" made by Capital One to the Agreement and the other documents.  *Id.*

The Credit Card Agreement stated that Capital One would charge interest "as disclosed on your Statement and other Truth-in-Lending Disclosures," and that Capital One "may increase" the interest charges "as described in the Changes to Your Agreement section or in your Truth-in-Lending Disclosures."  *Id.* at 3.  The "Changes to Your Agreement" section provided that:

> At any time, we may add, delete or change any term of this Agreement, unless the law prohibits us from doing so.  We will give you notice of any changes as required by law.  We may notify you of changes on your Statement or in a separate notice.  Our notice will tell you when and how the changes will take effect.  The notice will describe any rights you have in connection with the changes.  Your variable [Annual Percentage Rates ("APRs")] (if applicable) can go up or down as the index for the rate goes up or down.  If we increase your APRs for any other reason, or if we change your Fees or other terms of your Account, we will notify you as required by law.

*Id.* at 5. The Agreement specified that the references to "Truth-in-Lending Disclosures" relate to the "disclosures that the federal Truth in Lending Act and Regulation Z require" for credit card accounts, including disclosures in relation to "change in terms notices." *Id.* at 6.

With the approval of her credit card application, Strange received from Capital One a letter with attachments ("the Disclosure Notice") stating that her APR was 30.74 percent, and that it would "vary with the market based on the Prime Rate." Disclosure Notice at 3, Kurkowski Decl. Ex. B, ECF No. 27-4. Although the Credit Card Agreement did not state expressly how or when it would become effective, it stated through the Disclosure Notice that Strange was "not obligated to accept the card or pay any fee or charge unless [she] use[d] this card." *Id.* at 6.

## III.    Collection of Interest

Since Strange began using her Capital One credit card, Capital One has regularly charged and collected interest from her at an annual rate of approximately 30 percent. For example, on July 2, 2024, Capital One sent her a credit card statement in which it charged interest at an annual rate of 30.74 percent, or $42.42 on her account balance of $1,678.99 for the preceding month, which Strange paid, along with some of the principal on her account, on July 12, 2024. Capital One sent to Strange monthly credit card statements during the rest of 2024 in which it charged interest on her credit card balance at the same annual rate, and she paid such interest, along with some of the principal on her account, in relation to each statement. From January to September 2025, Capital One sent to Strange monthly credit card statements in which it charged interest on her balance at an annual rate of 29.74 percent, which Strange continued to pay each month. In October 2025, the month that the Amended Complaint was filed, Capital One charged interest at an annual rate of 29.49 percent.

## IV.    Procedural History

On July 16, 2025, Strange filed the original Complaint in this case in the Circuit Court for Prince George's County, Maryland.  Capital One timely removed the case to this Court.  In the operative Amended Complaint, Strange alleges that, because the Credit Card Agreement permits Capital One "to unilaterally change any term . . . including interest rate terms, at its whim," the Agreement is unsupported by consideration and thus "is not an agreement and was never formed as an agreement." Am. Compl. ¶ 52, ECF No. 20.  In turn, Strange alleges that when Capital One collected interest at annual rates of approximately 30 percent from her, it did so "despite the fact that it has no agreement with her which would allow it to do so," and "despite the fact that Capital One knew the interest it charged to and collected from her was in excess of the maximum rate Capital One was permitted to charge or collect under the National Bank Act." *Id.* ¶ 53.

On behalf of a putative class consisting of "[a]ll persons who paid interest at a rate of more than 6% per annum on a consumer credit card account with Capital One, where the credit card was accepted and first used in Maryland and where the 'Credit Card Agreement' for the account includes" the same "Changes to Your Agreement" clause present in Strange's Credit Card Agreement, *id.* ¶ 17, Strange alleges two claims in the following numbered counts:  (1) a claim of usury in violation of the National Bank Act, 12 U.S.C. §§ 85–86, in which she seeks damages measured at twice the amount of interest that Capital One collected from class members from two years before the filing of the original Complaint through the date of judgment; and (2) a claim for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, in which she seeks a declaratory judgment that Capital One may not collect interest from class members at a rate higher than six percent per year without an agreement, and that its prior collection of interest at higher rates was without a valid agreement and was thus unlawful.

## DISCUSSION

Capital One has filed a Motion to Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that (1) the Amended Complaint fails to state a plausible claim for relief under the National Bank Act; and (2) federal law preempts Strange's claims.

## I.    Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Courts are permitted, however, to consider documents attached to a motion to dismiss "when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)).

In this instance, Capital One has attached to the Motion the Credit Card Agreement in effect at the time that Strange opened her account with Capital One, the Disclosure Notice referencing

the applicable interest rate, some of Strange's monthly account statements, and a later version of the Credit Card Agreement. Although Strange opposes consideration of these submitted exhibits, where the Amended Complaint directly quotes provisions of the Credit Card Agreement, *see* Am. Compl. ¶¶ 33–34, and the Credit Card Agreement incorporates by reference "all disclosures and materials provided" to Strange when she opened her account which would include the Disclosure Notice, *see* Credit Card Agreement at 1, the Court finds that the Credit Card Agreement and the Disclosure Notice are integral to and explicitly relied on in the Amended Complaint. Further, where Capital One's counsel has submitted a sworn declaration stating that these documents are true and correct copies of the Credit Card Agreement and the Disclosure Notice that governed Strange's account when it was opened in February 2024, *see* Kurkowski Decl. ¶¶ 4–5, ECF No. 27-2, and where Strange plainly has had access to these documents and reviewed them in advance of filing the Amended Complaint but has not expressly challenged their authenticity, the Court will consider the Credit Card Agreement and the Disclosure Notice in ruling on the Motion.

## II.  National Bank Act Usury Claim

Capital One seeks dismissal of the National Bank Act usury claim in Count 1 on the grounds that Strange has not stated a plausible claim for a violation of that statute. As discussed above, a plaintiff asserting a usury claim under the National Bank Act must establish (1) that the bank charged or collected interest at a rate higher than the statute permits, which, as relevant here, is the rate permitted by Virginia law; and (2) that the bank did so knowingly. *See* 12 U.S.C. § 86.

Strange's claim is premised on the theory that Capital One's approximately 30 percent annual interest rate exceeded the rate permitted by Virginia law and therefore violated the National Bank Act. In support of this argument, Strange asserts that Virginia law sets a maximum interest rate of six percent if "there is no express contract to pay interest at a specified rate." Opp'n at 10,

ECF No. 30 (citing Va. Code Ann. § 6.2–301).  Strange further asserts that the Credit Card Agreement, although it purports to be a contract that permits an interest rate higher than six percent, was not a validly formed contract under Maryland law because it lacked consideration due to a provision that permitted Capital One to change any term of the Credit Card Agreement unilaterally. In the Motion, Capital One seeks dismissal of Strange's claims on the grounds that there was consideration for the Credit Card Agreement between Strange and Capital One, such that it was, in fact, a validly formed contract.

### A.    Virginia Law on Credit Card Interest Rates

As an initial matter, the Court disagrees with Strange's characterization of the relevant Virginia law governing interest rates.  First, section 6.2–301 does not set a maximum interest rate and instead states only that the "legal rate of interest shall be an annual rate of six percent" and that this rate "shall be implied when there is an obligation to pay interest and no express contract to pay interest at a specified rate." Va. Code Ann. § 6.2–301. The plain language of section 6.2–301 provides only that this legal rate is to be read into an agreement without an express interest rate, not that it is a legal maximum.

Second, regardless of how the six percent rate is characterized, the present case is governed by the more specific Virginia statute addressing the interest rate that may be charged by a credit card company, which provides that:

> Notwithstanding any statutory or case law, any bank or savings institution may impose finance charges and other charges and fees at such rates and in such amounts and manner as may be agreed by the borrower under an open-end credit plan.

Id. § 6.2–313.  Where there is no reasonable dispute that Capital One's arrangement with Strange is an open-end credit plan, see id. § 6.2–300, and where the statutory language "[n]otwithstanding any statutory or case law" explicitly demonstrates that this provision applies regardless of any

allegedly conflicting language in section 6.2–301, the Court finds that the requirement in section 6.2–301 of an "express contract to pay interest at a specified rate," which is absent from section 6.2–313, does not apply to credit card interest such as that charged by Capital One.

Nevertheless, Strange argues that even under section 6.2–313, a credit card company may charge an interest rate higher than six percent only if that rate was agreed to in a valid contract between the credit card company and the cardholder, based on the language providing that finance charges can be imposed "at such rates and in such amounts and manner as may be agreed by the borrower under an open-end credit plan." *Id.* § 6.2–313. Although its language is not as explicit as the "express contract" language in section 6.2–301 and does not include any requirement of a "specified rate," *id.* § 6.2–301, this provision arguably requires a contractual agreement relating to the credit card interest rate to be paid.

### B.    Choice of Law

Assuming without deciding that the Virginia statutory language requires that a credit card interest rate be the subject of a validly formed contract supported by consideration, the Court addresses the issue of whether the Credit Card Agreement is such a contract. Although the Credit Card Agreement states that Virginia law governs the agreement, the Court "cannot apply *any* provision of the contract, including its choice-of-law clause, before deciding if the parties formed an agreement." *Johnson v. Cont'l Fin. Co., LLC*, 131 F.4th 169, 178 (4th Cir. 2025). Where, as here, a case arises under federal law but incorporates a state law issue, and absent a compelling federal interest to do otherwise, a federal court applies the choice-of-law rules of the forum state, in this case, Maryland. *See In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 205–06 (4th Cir. 1988).

Under Maryland law, the question of whether a contract is valid and enforceable is governed by "the law of the jurisdiction where the contract was made." *Kramer v. Bally's Park*

*Place, Inc.*, 535 A.2d 466, 467 (Md. 1988). A contract is made "where the last act is performed which makes an agreement a binding contract." *Grain Dealers Mut. Ins. Co. v. Van Buskirk*, 215 A.2d 467, 471 (Md. 1965). Where it is undisputed that Strange accepted and first used the credit card in Maryland, and the Credit Card Agreement, through the Disclosure Notice, provided that Strange's obligations did not apply "unless [she] use[d] this card," Disclosure Notice at 6, the Court finds that the last act to establish a binding contract occurred in Maryland and thus will apply Maryland law to determine whether the Credit Card Agreement is a validly formed contract. *See Johnson*, 131 F.4th at 179; *see also* Md. Code Ann., Com. Law § 12–502(b)(1) (LexisNexis 2013) (stating that "a retail credit account is made in this State" if a "resident buyer of this State accepts or makes the offer in this State to buy"); *id.* § 12–501(*l*)(2) (defining a retail credit account to include "credit card financing by a financial institution").

### C.    The Change-in-Terms Clause

Under Maryland law, for a contract to be "binding and enforceable," there must be consideration, which "may be established by showing a benefit to the promisor or a detriment to the promisee." *Cheek v. United Healthcare of the Mid-Atl., Inc.*, 835 A.2d 656, 661 (Md. 2003) (quoting *Harford Cnty. v. Town of Bel Air*, 704 A.2d 421, 430 (Md. 1998)). In the Amended Complaint, Strange asserts that the "Changes to Your Agreement" section of the Agreement, which states that Capital One may unilaterally "add, delete or change any term of th[e] Agreement, unless the law prohibits" it and upon notice "as required by law" ("the change-in-terms clause"), renders the commitments made by Capital One illusory and thus incapable of supplying the necessary consideration to support the Agreement, such that no enforceable contract was ever formed between Strange and Capital One. *See* Credit Card Agreement at 5.

Strange stakes her argument on *Johnson v. Continental Finance Co., LLC*, 131 F.4th 169 (4th Cir. 2025), in which the United States Court of Appeals for the Fourth Circuit held that, under Maryland law, a "change-in-terms" clause in a credit card agreement that allowed the defendant bank to "change any term of th[e] Agreement . . . in our sole discretion, upon such notice to you as is required by law" rendered an arbitration agreement unenforceable because it lacked consideration and consisted entirely of illusory promises. *Id.* at 174, 179. In *Johnson*, the court stated that such a clause can be "so one-sided and vague that it allows a party to escape all of its contractual obligations at will," and that Maryland law "protect[s] consumers from change-in-terms clauses that allow sophisticated parties . . . to enjoy a built-in escape hatch from their contractual obligations." *Id.* at 179, 181.

*Johnson*, however, dealt specifically with the formation of an arbitration agreement contained within a credit card agreement, which is materially different from the broader credit card agreement. Under Maryland law, an arbitration agreement such as the one at issue in *Johnson* consists of a "mutual exchange of promises to arbitrate." *Holmes v. Coverall N. Am., Inc.*, 649 A.2d 365, 370 (Md. 1994). If such an arbitration agreement is contained within a broader contract, "the mutual promises to arbitrate constitute a separate agreement contained in the contract in question." *Id.* at 371. Like any contract, an arbitration agreement must be supported by consideration, which may be established by the parties' exchange of binding promises to forbear from litigation in the courts and to send any disputes to arbitration. *See Cheek*, 835 A.2d at 660–61. A non-binding promise, however, is not consideration and cannot, on its own, "support a legally enforceable agreement." *Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547, 553 (Md. 2006).

Based on these principles, in *Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 835 A.2d 656 (Md. 2003), the Court of Appeals of Maryland, now the Supreme Court of Maryland, held that an arbitration agreement between an employer and an employee was not an enforceable agreement because a change-in-terms clause in the arbitration policy, which stated that the employer "reserves the right to alter, amend, modify, or revoke the [Arbitration] Policy at its sole and absolute discretion at any time with or without notice," rendered the employer's promise to arbitrate "no real promise, and therefore, insufficient consideration to support an enforceable agreement to arbitrate." *Id.* at 662. The court noted that the change-in-terms clause even permitted the employer to revoke the agreement to arbitrate after an arbitration ruling was issued, if the employer was dissatisfied with the decision. *Id.* Further, the court specifically rejected the notion that, in relation to an arbitration agreement contained within a broader contract, "consideration from [the] underlying contract . . . can support [the] arbitration clause and render it enforceable." *Id.* at 668.

Similarly, in *Johnson*, in which the plaintiff asserted than an arbitration agreement contained within a credit card agreement was not a valid contract due to a change-in-terms clause permitting the bank to change any term of the credit card agreement unilaterally, the Fourth Circuit stated that the case was "indistinguishable" from *Cheek* and held that the arbitration agreement was never validly formed. *Johnson*, 131 F.4th at 179. In so ruling, the court also found that the commitment to provide notice of a change as "required by law" did not provide consideration because a "bargained-for-exchange by definition assumes that each party will undertake some obligation beyond those already imposed by law." *Id.* at 180; *cf. Holloman*, 894 A.2d at 554 (upholding an arbitration agreement despite a change-in-terms clause because the agreement could

12

be changed only on one day of the year and required 30 days of notice, which thus necessarily created a binding obligation to arbitrate during the 30-day period).

Thus, while *Cheek* and *Johnson* establish that a change-in-terms clause like the one in the Credit Card Agreement in this case can undermine the consideration for a contract, they hold only that an arbitration agreement contained within a contract that includes such a term will be deemed to have never been formed and thus unenforceable. *See Cheek*, 835 A.2d at 663, 669; *Johnson*, 131 F.4th at 179–80. The lack of an enforceable arbitration agreement is based on the reasoning that such an agreement consists of a mutual exchange of promises to arbitrate in the future if a dispute arises, but a term allowing one party unilaterally to change any term in the contract effectively renders that party's promise to arbitrate non-binding and thus insufficient to serve as consideration for the agreement. *See Johnson*, 131 F.4th at 179. It is further based on the principle that "consideration for an underlying contract" cannot "serve as consideration for an arbitration provision within that contract," which precludes reliance on any other promises made in the broader contract to provide the requisite consideration for the arbitration agreement. *See Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 607 (4th Cir. 2013) (citing *Cheek*, 835 A.2d at 667); *Holmes*, 649 A.2d at 371; *see, e.g.*, *Ford v. Genesis Fin. Sols., Inc.*, 726 F. Supp. 3d 441, 459 (D. Md. 2024) (holding that an arbitration agreement in a credit card agreement was not enforceable because the change-in-terms clause rendered the promise to arbitrate illusory), *aff'd*, No. 24-1341, 2025 WL 1540933 (4th Cir. May 30, 2025); *Bailey v. Mercury Fin., LLC*, 694 F. Supp. 3d 613, 624 (D. Md. 2023) (same), *aff'd*, No. 23-2133, 2025 WL 763671 (4th Cir. Mar. 11, 2025).

Here, however, the Credit Card Agreement is supported by consideration not undermined by the change-in-terms clause. Specifically, the Credit Card Agreement stated that Capital One would notify Strange of her "initial revolving credit line," Credit Card Agreement at 1, thus

13

establishing a commitment by Capital One to extend to Strange a line of credit, which generally provides to a cardholder "the opportunity to obtain goods, services, and cash from entities with which [the credit card company] had contracted, with [the credit card company] reimbursing the merchants and looking to her for payment." *In re Mercer*, 246 F.3d 391, 406 (5th Cir. 2001) (en banc). A customer's use of a credit card with such a line of credit generally establishes a "loan request and promise to pay" the credit card company, specifically "the obligation to pay the charges by making at least the minimum monthly payments." *Id.*

In addition to providing a line of credit, Capital One made other commitments in the Credit Card Agreement and the incorporated Disclosure Notice, including in relation to the calculation of her variable interest rate and minimum payment, the method by which payments are applied to balances, the conditions under which interest is charged, and the provision of a cash back rewards program. For example, the Credit Card Agreement provided that Capital One agreed to calculate the interest rate "by adding a [specified] percentage to the Prime Rate published in *The Wall Street Journal* on the 25th day of December, March, June and September." Disclosure Notice at 4. It also agreed that, for balances of at least $25, the "minimum payment will be the greater of $25 or 1% of your balance plus new interest and late payment fees." *Id.* Moreover, Capital One also agreed to "apply any part of your payment exceeding [the] minimum payment to the balance with the highest APR, and then to balances with lower APRs." Credit Card Agreement at 4. It further agreed that "we will not charge you interest on any new transactions . . . if you paid the total balance . . . in full by the due date" listed in the monthly statement. *Id.* at 3. Beyond these provisions, Capital One also agreed to provide cash back of certain specified percentages on purchases of certain categories of goods and services. These commitments, when read together with the language relating to the provision of a revolving credit line, both bolster the conclusion

that Capital One made a commitment to extend credit to Strange in exchange for her promise to pay her credit card balance, charges, and fees, and also provide additional forms of consideration supporting the Credit Card Agreement.

These forms of consideration differ materially from the non-binding promise underlying the kind of arbitration agreement invalidated in *Johnson* and are not completely undermined by the change-in-terms clause. Although the change-in-terms clause in the Credit Card Agreement generally allows Capital One to change any term, under Maryland law, "an unlimited option to cancel" a contract or a particular term "does not invalidate a contract where it [otherwise] can be shown that it does not wholly defeat consideration." *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 673 (Md. 2009); *see Tyler v. Capitol Indem. Ins. Co.*, 110 A.2d 528, 530 (Md. 1955). Such a showing can be made when the party with the power to terminate or amend a contract or its terms "is irrevocably bound for any appreciable time or has materially changed any of his relations or otherwise rendered some performance capable of operating as a consideration." *Questar Builders*, 978 A.2d at 673 (quoting *Acme Mkts., Inc. v. Dawson Enters., Inc.*, 251 A.2d 839, 846 (Md. 1969)).

In this instance, because the change-in-terms clause permitted Capital One to "add, delete or change" a term "unless the law prohibits us from doing so" and subject to the requirement that it provide "notice of any changes as required by law," Credit Card Agreement at 5, Capital One was bound to adhere to certain terms relating to the interest rate, fees, and minimum payment during the period of time prior to the date when any unilateral change in those terms could take effect consistent with legally required notice periods. More specifically, Regulation Z, promulgated to implement the Truth in Lending Act, 15 U.S.C. §§ 1601–1667f, requires lenders to provide written notice at least 45 days before the effective date of any "significant change in

account terms" of a credit card agreement, such as a change to the method of calculating a variable interest rate, any annual or periodic fees, any transaction charges, the method of computing the account balance, or the required minimum periodic payment. 12 C.F.R. § 1026.9(c)(2); *see id.* § 1026.6(b). The borrower may reject any such change before its effective date. *See id.* § 1026.9(c)(2)(iv)(B). Thus, there is a 45-day period in which Capital One is "bound for [an] appreciable time" before it can back out of many of its contractual commitments to Strange, and the change-in-terms clause therefore "does not wholly defeat consideration." *Questar Builders*, 978 A.2d at 673. For example, even if it sought to change the method of computing the interest rate or increase the minimum payment shortly after Strange started to use the credit card, it would be required to apply the previously established interest rate and minimum payment amount to purchases already made during the first 45 days after providing notice of the change.

Importantly, although the *Johnson* court stated that a commitment to provide notice as required by law cannot by itself supply the consideration necessary to uphold a contract, *see Johnson*, 131 F.4th at 180, in this instance the legally mandated notice period is not itself the consideration upholding the agreement; rather, it establishes a 45-day time period during which at least some of the consideration upholding the Credit Card Agreement must be maintained despite the change-in-terms clause. In contrast, no such law or requirement was present in *Johnson*. *See id.* at 181 (stating that the contractual notice provision did not provide consideration in part because it did not require advanced, detailed notice and did not afford the customer any right to reject changes).

Further, as acknowledged in the Amended Complaint, Strange repeatedly used her credit card to make purchases and performed under the Credit Card Agreement by making monthly payments, and Capital One actually rendered performance of the bargained-for exchange by

16

extending credit to her for those purchases as consideration for her promise to repay the loans. Therefore, Capital One "rendered some performance capable of operating as a consideration" in relation to transactions that it had already authorized, thus illustrating that the change-in-terms clause did "not wholly defeat consideration" or render the entire contract illusory. *Questar Builders*, 978 A.2d at 673; *see also Harford Cnty. v. Town of Bel Air*, 704 A.2d 421, 430 n.11 (Md. 1998) (noting that a party that has consistently performed under an agreement may be estopped from claiming that the agreement lacks consideration).

Thus, where the Credit Card Agreement was supported by consideration separate and apart from mutual promises of future action such as those in an arbitration agreement, the Court will not extend *Johnson* beyond the context of arbitration agreements to render the Credit Card Agreement unenforceable based on the unilateral change-in-terms clause. *See Johnson*, 131 F.4th at 181–82 & n.* (Wynn, J., concurring) (noting that the *Johnson* court was not asked to decide whether the broader credit card agreement that contained the arbitration agreement at issue was supported by consideration, and that a change-in-terms clause is "not necessarily fatal to the cardholder agreement itself" because the company's "provision of services in exchange for payment may suffice as consideration for that broader contract"). Notably, Strange has not cited, and this Court has not identified, any published cases in which a court has applied the reasoning of *Johnson* beyond the context of an arbitration agreement. In *Egahi v. WorldRemit Corp.*, No. JKB-24-3728, 2026 WL 73776 (D. Md. Jan. 9, 2026), the only identified case that arguably did so, the court concluded that both an arbitration agreement and the broader user agreement in which it was contained were not validly formed based on the inclusion of a unilateral change-in-terms clause materially identical to the clause at issue in *Johnson*, but it reached that conclusion with limited

17

discussion and where the plaintiff had not argued that the user agreement was a properly formed contract. *Id.* at *6.

### D.    Additional Provisions

At the hearing on the Motion, Strange advanced alternative arguments for the lack of consideration beyond the effect of the change-in-terms clause, including that the Credit Card Agreement, as a whole, includes no binding promises by Capital One, and that clauses allowing Capital One to close or suspend Strange's account at any time, and to decline to authorize a transaction at any time, render any promises illusory. As an initial matter, although these clauses were briefly referenced in the Amended Complaint, where the pleading overall focuses almost exclusively on the change-in-terms clause, the descriptions of the specific counts in the Amended Complaint reference only that clause, and the proposed class is defined only in relation to that clause, the Court finds that the Amended Complaint does not advance a claim based on the additional arguments discussed at the hearing and certainly does not provide sufficient notice of such claims. A party may not amend a pleading through a brief on a motion to dismiss and certainly cannot do so for the first time at a hearing on such a motion. *See Zachair, Ltd v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997).

Even considering such arguments, the Court finds that they do not provide a basis to preclude dismissal or to permit amendment to add claims based on such arguments. First, as discussed above, the Credit Card Agreement, while focusing more heavily on obligations by Strange, contains multiple provisions constituting commitments by Capital One and therefore generally is supported by consideration. *See supra* part II.C.

Second, the clauses permitting Capital One to close Strange's account or to decline to authorize a transaction do not render the promises in the Credit Card Agreement illusory. First,

neither of these provisions, nor the change-in-terms clause for that matter, can be fairly read to allow Capital One unilaterally to terminate the contract entirely. A decision to close Strange's account, on its face, would not fully terminate the contract and would only prevent Strange from incurring new charges on the credit card. Where that provision specifically states that in the event of an account closure, Strange "must still pay us all amounts you owe on the Account," Credit Card Agreement at 5, it is clear that Capital One would remain bound to its obligations in relation to prior charges on the credit card, such as those relating to the applicable interest rates and minimum payments. *See Gray v. Am. Express Co.*, 743 F.2d 10, 15, 19 (D.C. Cir. 1984) (concluding that, under New York law, a provision in a credit card agreement stating that the issuer "can revoke your right to use [the card] any time . . . with or without cause and without giving you notice" did not permit revocation "for transactions that already have occurred"). Likewise, the provision allowing Capital One to "decline to authorize a transaction for any reason" does not relieve Capital One of its obligations, such as those relating to the interest rate charged and the means by which payments are allocated, in relation to charges previously authorized. Credit Card Agreement at 1; *see* 1 Corbin on Contracts § 2.33 (rev. ed. 1993) (stating that if an offer of credit pursuant to a credit card agreement is "still revocable as to any subsequent acceptance," "revocation should not be effective as to a transaction . . . that has occurred prior to notification [of revocation], unless the revocation is for good cause as in the case of overdue accounts").

To the extent that Strange may argue that these provisions could allow Capital One to decline to authorize any transactions or to close Strange's account before incurring any obligations relating to previous purchases, such an argument fails because the contract is not actually formed until the cardholder has used the credit card to make an authorized purchase. As discussed above, the Credit Card Agreement, through the incorporated Disclosure Notice, stated that Strange was

"not obligated to accept the card or pay any fee or charge unless [she] use[d] this card." Disclosure Notice at 6. Therefore, Strange's obligations to Capital One became binding, and the Credit Card Agreement became an enforceable contract between the parties, once Strange used the credit card for a specific transaction. *See Carrasco v. M&T Bank*, No. SAG-21-532, 2021 WL 4846844, at *6 (D. Md. Oct. 18, 2021) (stating that a cardholder accepted the terms of the credit card agreement by using the card, where the agreement expressly provided for this method of acceptance). Even in the absence of an express provision in a credit card agreement setting forth a method of acceptance, courts generally consider the use of a credit card as the act of acceptance of a credit card agreement. *See, e.g., Whitman v. Cap. One Bank (USA), N.A.*, No. WMN-09-1737, 2009 WL 4018523, at *2 (D. Md. Nov. 19, 2009); *Audish v. Am. Express Co.*, No. 21-CV-10127-GHW-OTW, 2023 WL 2366888, at *3 (S.D.N.Y. Mar. 6, 2023); *Fahey v. U.S. Bank Nat'l Ass'n*, No. 05-CV-01453-FRB, 2006 WL 2850529, at *2 (E.D. Mo. Sept. 29, 2006). Thus, upon the formation of the contract, there necessarily was at least an initial authorized transaction for which Capital One was obligated to honor its commitments to provide credit at an identified interest rate, with a certain minimum payment, and subject to other related terms, which thus provided consideration for Strange's promise to pay, regardless of whether Capital One subsequently declined other transactions or closed Strange's account.

Finally, as discussed above in relation to the change-in-terms clause, where Strange, in fact, repeatedly used the credit card over multiple years to make purchases that were actually authorized, Capital One's performance of the bargained-for exchange by extending credit to her for those purchases also provided consideration for the Credit Card Agreement. *See supra* part II.C; *Questar Builders*, 978 A.2d at 673. Indeed, in relation to credit card agreements, many courts treat the credit card company's performance in financing a specific transaction as both the act

20

forming a unilateral contract between the cardholder and the credit card company and the consideration for that contract. *See, e.g., In re Anastas*, 94 F.3d 1280, 1285 (9th Cir. 1996) (stating that each credit card transaction can be viewed as "the formation of a unilateral contract between the card holder and card issuer consisting of the following promise in exchange for performance: the card holder promises to repay the debt plus to periodically make partial payments along with accrued interest and the card issuer performs by reimbursing the merchant who has accepted the credit card in payment"); *In re Mercer*, 246 F.3d at 406 (stating that "[w]e agree with the Ninth Circuit that each card-use forms a unilateral contract" under which the card holder "promises to repay the debt" and the card issuer "performs by reimbursing the merchant"); *see also Barclays Bank Del. v. Bamford*, 277 A.3d 151, 160–61 (Conn. App. Ct. 2022) (stating that "a majority of courts have adopted a theory of contract that 'draws upon common law principles of contract law and interprets each credit card transaction as a unilateral contract in which the cardholder unilaterally promises to repay the debt being incurred, in accordance with the terms set forth in the credit card agreement, in exchange for the issuing bank's performance (i.e. reimbursing the merchant for the goods)'" (quoting *Bank of America v. Jarczyk*, 268 B.R. 17, 21–22 (W.D.N.Y. 2001))). In a unilateral contract, the act of performance by the offeree "constitutes both the consideration for the promise contained in the offer and an outward manifestation of the offeree's assent to the offeror's proposed terms." 2 Williston on Contracts § 6:2 (4th ed. 2023). The Fourth Circuit, in addressing a "standing floorplan financing agreement" under Illinois law, noted that unilateral contracts can "apply to financing, such as credit-card financing," such that "[u]ntil the customer uses the card, the finance company may cancel its financing offer," and concluded that when the finance company "approved a transaction for financing . . . it began its performance" and

was bound by the contract. *Sharp Elecs. Corp. v. Deutsche Fin. Servs. Corp.*, 216 F.3d 388, 389, 394 (4th Cir. 2000).

Although the Court has not identified Maryland legal authority framing the contract between a credit card company and a cardholder in this specific way, Maryland law recognizes both unilateral contracts and, as discussed above, the principle that performance can constitute consideration. *Pavel Enters., Inc. v. A.S. Johnson Co.*, 674 A.2d 521, 526 n.7 (Md. 1996) (stating that an offer to form a unilateral contract "is accepted, not by traditional acceptance, but by performance"); *Questar Builders*, 978 A.2d at 673 (providing that the power to terminate a contract does not invalidate it if the party with that power "otherwise rendered some performance capable of operating as a consideration"). Under these circumstances, the Court finds that the fact that Capital One performed by repeatedly authorizing credit card transactions and providing financing for those transactions under the terms in the Credit Card Agreement demonstrates that its agreement with Strange, whether viewed as a broad Credit Card Agreement as contemplated by the parties or as a series of agreements arising from each transaction, was supported by consideration. The Court therefore finds that the Credit Card Agreement was a validly formed contract on this basis as well.

For all of these reasons, the Court concludes that Strange cannot succeed on her National Bank Act claim based on the argument that she had no agreement with Capital One permitting it to charge interest at an annual rate of approximately 30 percent.

## E.    Variable Interest Rate

Finally, Strange appears to assert that, even if the Credit Card Agreement is found to be an enforceable contract supported by consideration, the variable interest rate term of the Credit Card Agreement is too indefinite and thus does not constitute a binding promise to pay a particular

22

interest rate. If construed as a challenge to the formation of the contract based on a variable interest rate, this argument fails. Where the Court has concluded that the Credit Card Agreement is a properly formed contract, it also concludes that the interest rate term is part of the Agreement despite its variable nature. If this argument is instead construed as a challenge to the validity of this specific term of the contract, the Credit Card Agreement provides that such a challenge would be governed by Virginia law. Strange has cited no authority for such a limitation on a variable interest rate other than Va. Code Ann. § 6.2–301, which, as discussed above, does not impose such a limitation on credit card agreements. *See supra* part II.A. Rather, Virginia law elsewhere permits variable rates. *See* Va. Code Ann. § 6.2–433(B).

For these reasons, the Court concludes that the Amended Complaint has failed to allege facts establishing that the Credit Card Agreement was not a validly formed contract under Maryland law. In turn, where Virginia law allows interest to be charged at rates set forth in an agreement between the parties, *see id.* § 6.2–313, Strange cannot establish that Capital One charged an interest rate higher than permitted by Virginia law and cannot succeed on her National Bank Act usury claim. The Motion to Dismiss will be granted as to Count 1.

## III.    Declaratory Judgment Claim

Capital One also seeks dismissal of Strange's claim for a declaratory judgment in Count 2. A declaratory judgment is a "form[] of relief," not a freestanding claim, and it may be granted only if there is otherwise "a valid cause of action" before the Court. *Univ. Gardens Apartments Joint Venture v. Johnson*, 419 F. Supp. 2d 733, 742 (D. Md. 2006). Where the Court will dismiss the National Bank Act usury claim in Count 1, the only other count in this case, the claim for a declaratory judgment must be dismissed as well. The Motion will therefore be granted as to Count 2.

Where both counts will be dismissed for failure to state a claim, the Court need not and will not address Capital One's additional arguments for dismissal.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss will be GRANTED, and the Amended Complaint will be DISMISSED.  A separate Order shall be issued.

Date:  July 20, 2026



THEODORE D. CHUANG
United States District Judge

24